[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 11130
 ARTICLE I The Dissolution of the Marriage
It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
 ARTICLE II The Determination of the Value of the Marital Home
Peter Marsele, a qualified real estate appraiser called by plaintiff, testified that the marital home situated at 98 Riggs Avenue, West Hartford, Connecticut had a value of $170,000 in January, 2001, and that property values in that area of West Hartford were increasing at the rate of one percent per month. Plaintiff's most recent financial affidavit, dated June 20, 2001, values the marital home at $175,000 and confirms the testimony of Mr. Marsele.
Michael F. Smith, also a licensed real estate appraiser, testified on behalf of the defendant that the marital home had a value of $215,000 on February 16, 2001. He further stated that real estate appreciated 14.1 percent per year in the neighborhood.
This court found the testimony of Mr. Marsele to be more weighty and persuasive. It concludes by stating that the fair market value of the marital home at this time is $190,000.
It is further found that the family home was purchased in August, 1994 for $162,500, that title was placed in plaintiff's name alone, that a mortgage was placed on said property in the amount of $122,500, that only plaintiff signed the mortgage and note, and that the $40,000 balance was supplied solely by the plaintiff and her father with defendant paying $400 in closing costs.
 ARTICLE III The Marital Estate of the Parties
Plaintiff
98 Riggs Avenue value $190,000 West Hartford, CT less mtg. -119,000 CT Page 11131 _________ equity $71,000 $71,000
Timeshare in Florida $12,000 (1/2 interest with brother)
Timeshare in Florida — unit 106 $2,000 (1/2 interest with defendant)
1993 Volvo $6,450
Personal Prop. H.H.F. —
Fleet C/A —
Phoenix Life Ins. F.V. $400,000 C.S.V. $7,500
Paine Webber $52,400
State Street I.R.A. $9,500
T.I.A.A. 403(B) (in lieu of Soc. Sec.) $152,000
Vanguard Investments $28,300 _________ Subtotal $341,150
Defendant
Timeshare in Florida — unit 106 (1/2) $2,000
Mechanic's C/A $200
V.W. (Jetta) value $19,000 — loan $17,000 ________ equity $2,000 $2,000 _______ Subtotal $4,200
 ARTICLE IV Pertinent Information Covering Various Accounts Itemized by Plaintiff in her Financial Affidavit
Paine Webber Account
CT Page 11132
Present Value $52,400
Pre-marital Value $47,800
Mechanics I.R.A. (Now State Street I.R.A.)
Present Value $9,500
Pre-marital Value $1,700
T.I.A.A. 403B
Present Value $152,000
Pre-marital Value $14,900
 These accounts represent plaintiff's retirement accounts and are in lieu of social security.
Vanguard Investments
Present Value $28,300
*Vanguard Investments were all purchased with gifts from her father.
Time Share
Present Value $12,000
Pre-marital Value $12,000
 ARTICLE V. An Examination of the Evidence as it Relates to Section 46b-81c C.G.S.
A. General Background Information
The plaintiff wife and the defendant husband, both of whom are forty four years of age, were married on September 7, 1991, almost ten years ago. The marriage has been childless.
Following their marriage the parties resided for about three years in a condominium they rented in Farmington. In August 1994, they moved to a home purchased at 98 Riggs Avenue, West Hartford, where they still CT Page 11133 reside.
B. Education, Health and Employment
1. Plaintiff
Plaintiff graduated from the University of Richmond with a B.A. degree and in 1988 received a B.S. degree in public health and physiotherapy from the University of Connecticut. She has been employed for the last thirteen years as a physical therapist at the University of Connecticut Health Center in Farmington where she has earned between $1,000 and $1,100 per week. On February 12, 2001 she fell, fracturing the radial bone in her left hand. When trial of this matter began in April, 2001, she was still being treated for this injury and was receiving $577 weekly in workers compensation. When the trial concluded two months later after several continuances, she was working part-time and anticipated earning $1,128 gross weekly beginning in late July.
Aside from the injury to her arm, plaintiff appears to be in good health.
2. Defendant
Defendant graduated from Gilbert High School in Winsted, then attended Green Mountain College in Vermont and Northeast Central Community College in Connecticut where he pursued a career in nursing. In 1987 he began selling medical equipment, more particularly orthopedic appliances for various companies. In August, 1987, his car was struck by a drunken driver, resulting in his sustaining serious injuries to his hand, neck and chest. He was out of work for a long period of time thereafter, was unable to make mortgage payments on his home, and finally was forced into bankruptcy. He returned to work in the spring of 1988.
After meeting and later dating plaintiff, defendant candidly told plaintiff of his failed previous marriage and financial debacle.
Defendant's financial affidavit submitted at the commencement of trial on April 23, 2001 named his employer as Orthosonics, Ltd., his gross weekly income to be $1,163 and his weekly net after the usual deductions plus travel and entertainment deductions of $265 to be $391.
Aside from his car related injuries, and a complaint of high blood pressure, defendant appears to be in robust good health.
C. Fault
CT Page 11134
1. Plaintiff
Plaintiff's major complaint concerning defendant was his complete inability to handle his own or family finances. She began her testimony by stating "Everything was separate and I'd tell him what one half of the expenses were and he'd pay me. We never had any joint accounts." In spite of such precaution, defendant began his marriage by charging the honeymoon on plaintiff's credit card and continued thereafter charging to plaintiff medical supplies used in his employment. In 1996 defendant "maxed out" two of plaintiff's credit cards. In July 1996, defendant charged $1,800 to plaintiff's account for medical products and $2,700 the following month. In plaintiff's words "I felt betrayed and ripped up the credit cards." Defendant's financial problems continued in 1997. At that time plaintiff described the marital relationship as strained. "I received numerous calls from credit card companies. We'd talk about this problem several times a week." In 1998 plaintiff managed to repay the balances defendant had accrued on four different credit cards. In plaintiff's words "these payments represented defendant's business expenses he had not paid off."
As an aside but in keeping with the disjointed financial family affairs, plaintiff mentioned that defendant in 1998 was in an accident while driving her car. Although he received $37,500 in settlement, her total receipt from defendant was $2,800 representing the damage to her car.
Walter Sushi, a C.P.A. retained by defendant to untangle his financial muddle, testified in court that "In December, 2000, defendant retained my services to prepare his federal tax return for 1994-1997. I haven't done this yet because I have received no information from the defendant."
While plaintiff's principal complaint was defendant's lack of financial responsibility, she mentioned briefly other marital problems. She testified that "from the beginning we didn't spend time as a couple. He would yell and scream at me and would say "why do I have to give you a hug and a kiss." She concluded by stating "I stayed in the marriage so long because that was the way I was brought up. I hoped he would change and improve."
2. Defendant
Defendant's testimony on this factor was far less detailed than that of plaintiff. He testified that "I didn't file my tax returns for 1995-1997 because I was overwhelmed. I was worried about my earnings. I felt there was possibly trouble with my marriage in 1998." On another occasion he stated that "we had separate lives but a normal life together. We enjoyed CT Page 11135 family functions." He admitted that "she was upset in 1996 when she found out I charged $14,000 in inventory on her credit card."
After considering all of the evidence on this factor, the court concludes that responsibility for the breakdown of the marriage rests solely with defendant.
D. The Contribution of Each of the Parties in the Acquisition, Preservation or Appreciation of Value of the Marital Estate.
It should be noted at the onset that an accurate description of plaintiff's pre-marital property which she brought into the marriage represents a mathematical challenge of major proportions. That plaintiff's claims were not successfully, if at all rebutted by defendant, makes the task of the court less difficult.
On this factor the court determines that plaintiff's contribution in the acquisition, preservation or appreciation in value of the marital estate exceeds by far those by defendant.
E. Other Factors
1. In their separate types of employment the parties are equally skilled, and their incomes in the future should be reasonably similar.
2. Comparative Retirement Benefits of the Parties
Defendant, based on his past earnings will receive $675 per month if he retires at age 62 and will receive $1,000 per month if he retires when 66 1/2.
Plaintiff's T.I.A.A. and 403B have a total present value of $152,000, $14,900 of which is pre-marital.
Plaintiff, because of the nature of her employment will not receive social security. Instead, she testified that her T.I.A.A. and 403B accounts may be used to purchase an annuity upon her retirement. Financial information on this expectation was not submitted.
3. All other factors set forth in Sec. 46b-81c C.G.S. were considered by the court but do not require extended comment.
Conclusion:
Having considered all of the provisions of Sec. 46b-81c C.G.S., and having given particular weight to such predominant factors as fault and CT Page 11136 the comparative contributions of the parties to the martial estate, the court divides the marital estate of the parties as follows:
Plaintiff 87 percent in value
Defendant 13 percent in value
 ARTICLE VI The Distribution of the Marital Estate in Accordance With the Provisions of Sec. 46b-81c C.G.S.
Total Marital Estate $345,350
Plaintiff's 87 percent share $300,454
Defendant's 13 percent share $44,896
A. Plaintiff Shall Take and Have:
 Real estate at 98 Riggs Avenue, West Hartford, CT equity $71,000
 Time share in Florida (1/2 interest with brother) 12,000
1993 Volvo 6,450
Personal property H.H.F. —
Fleet C.D. —
Phoenix Life Ins. F.V. $400,000 C.S.U. 7,500
Paine Webber 52,400
State Street I.R.A. 9,500
T.I.A.A. 403B 152,000
 Vanguard Investments 28,300 __________ Subtotal $339,150 Less amount due defendant -38,696 __________ TOTAL $300,454 CT Page 11137
B. Defendant Shall Take and Have:
Time share in Florida — Unit 106 $4,000
Mechanics C/A 200
V.W. (Jetta) equity 2,000
 Amount due from plaintiff 38,696 _________ TOTAL $44,896
Said amount of $38,696 shall be paid to defendant within three months from the date hereof and if not paid within said period of time shall bear interest at eight percent per annum thereafter.
 ARTICLE VII Personal Property
The stipulation of the parties concerning the distribution of certain items of personal property, a copy of which is attached hereto, is hereby made an order of the court.
 ARTICLE VIII Liabilities
Each party shall be solely responsible for all liabilities shown on his or her financial affidavit except that defendant shall be exclusively responsible for his car loan debt. Further, defendant shall within sixty days have plaintiff's name removed from all loan obligations with reference to his car.
 ARTICLE IX Other Orders
A. Each party shall execute all documents necessary to carry out the orders of the court.
B. Plaintiff's maiden name of Charlotte Massie is ordered restored to her.
 EXHIBIT X
CT Page 11138 Alimony
Having considered and weighed all the evidence as it relates to Sec.46b-82 C.G.S., the court orders that no award of alimony be made to either party.
 ARTICLE XI Plaintiff's Potential Worker's Compensation Claim
On all the evidence, particularly that concerning the manner in which the proceeds of defendant's accident settlement in December, 1999 was distributed, the court awards any settlement or award resulting from plaintiff's injury to her hand solely to the plaintiff.
 ARTICLE XII H. Stuart Massie, Jr.'s Motion to Intervene
On March 7, 2001 H. Stuart Massie, father of the plaintiff, was granted permission to intervene in this dissolution action instituted by his daughter. He claimed that he had loaned the parties $11,000 at the time the marital home was purchased. He seeks a determination by the court whether he should receive his loan or a portion thereof back from the defendant.
During the trial Mr. Massie testified that he gave a check for $11,000 to the plaintiff to assist in her purchase of the marital home "provided that the deed was to plaintiff alone." No promissory note was signed by either plaintiff or defendant, and Mr. Massie had only the check as written evidence of the transaction. He further testified that "I never made any effort to collect the money and I can understand why some people might consider it a gift."
After considering all the evidence on this issue, the court determines that the defendant is not required to repay any part of said $11,000 to Mr. Massie.
John D. Brennan Judge Trial Referee August 14, 2001
 SCHEDULE A
[EDITORS' NOTE: SCHEDULE A IS ELECTRONICALLY NON-TRANSFERRABLE.] CT Page 11139